May I proceed, Your Honor? Yes. Thank you. Good morning, Your Honors, and may it please the Court. Alfred Pfeiffer of Bingham McCutcheon on behalf of the appellates. There is a clearly established standard that is supposed to apply to the issuance of all injunctions, including those in bankruptcies. Both the Bankruptcy Court and the Bankruptcy Appellate Panel failed to apply that standard in this case. In doing so, Your Honors, they have not afforded any meaningful protection to the debtor, which may have been their goal, because the debtor has really never been at any risk in this case. But what they have done instead, they have shielded, effectively immunized, a non-bankrupt individual, Ned Hoffman, and saved him from his well-deserved and, at this point, very long-delayed Day of Justice. That was clear error, and when the proper injunction standard is applied, Your Honors, no injunction can be sustained in this case. The standard for the issuance of an injunction on review is abuse of discretion, and this injunction was abuse of discretion. Counsel, you've argued that the BAP has applied the wrong standard. If we agreed with you on that point, are you asking us to simply decide the whole thing on the merits ourselves, or are you asking us to send it back for further proceedings under the correct standard? In these circumstances, Your Honor, I believe the appropriate thing for you to do is to vacate the injunction and decide it on the merits, in part because the standard that should be applied, in light of the record that has been made in this case, is so clear. And also, the second part, Your Honor, is that so much time has passed. Even in the limited set of cases that we both sides have discussed with the Court that have actually issued an injunction protecting a non-debtor, the lifespan of those injunctions has been consciously very short, 60 days, 90 days, maybe at most 120 days. In this case, Your Honor, we have an injunction of literally indefinite and almost infinite duration that has already been in place for over a year and a half. Whatever benefits may have been found that should have flowed with that injunction, there was plenty of time for those to have flowed. Instead, in this case where we are, and the reason I believe this injunction is a calculated abuse of the bankruptcy system by Mr. Hoffman and by Excel, is because this is three years into a reorganization case. There is still no hint, not a whisper, of a plan of reorganization from the debtor. No evidence in this record that they're even doing anything toward a plan of reorganization. And this injunction has been in place for a year and a half, and none of that has changed. You've seen no motion from the other side to add to the record in this case to tell you, look here, here's all our wonderful progress toward a reorganization. That's because nothing has happened. Nothing's been done. The time to end this injunction is now. Counsel, as you're well aware, we have issues of finality of the order. We have issues as to whether this is an unusual circumstances case, whether we should adopt the Fourth Circuit's approach, which has previously been rejected by one of the previous panels. And we have all kinds of evidentiary issues that were never really taken up. I'd like to go with the usual approach, typical for a preliminary injunction or the unusual circumstances. What does likelihood of success on the merits mean in this case? Well, I think, Your Honor, it is correct that in this case the bankruptcy appellate panel applied a standard that this Court has never adopted. It applied likelihood of a successful reorganization. I think, I do believe, Your Honor, that that would not be an appropriate standard for this Court to adopt, in part because of the extreme evidentiary uncertainties that that would introduce into the analysis. Unlike a likelihood of success on the merits of a claim in the complaint, there would be virtually no legal guidance for the Court. You couldn't look at this and say, well, have they established privity, as in other handling cases. Okay. But that's one of the standards, regardless of which of the two approaches we take on preliminary injunction, isn't it? The likelihood of success, isn't that one of the prongs? Yes, Your Honor, but not likelihood of success. What I'm saying is that that prong should not be interpreted to mean likelihood of a successful reorganization. What does it mean? I believe it means likelihood of success on one of the underlying substantive claims in the complaint in this case, Your Honor, which is why we believe as a matter of law there is no possibility of success. And your authority for that? For what? What is your authority for that? For why it should be? Why it should be success on one of the underlying causes of action, I gather, in this case in the arbitration. No, Your Honor, it wouldn't be on the arbitration. It would be in the adversary complaint. Okay. That was the basis for the injunction here. Okay. Well, for example, as one of Excel's own cases, the Kassner case, put it, that's authority for it. That case cited to the Morgan Busby decision of 272 bankruptcy record 257, which is a bankruptcy appellate panel from the Ninth Circuit decision, and that said, quote, the merits always refer to some underlying substantive claim. And that's what we believe is the appropriate standard for likelihood of success on the merits. Okay. I want you to go just a little slower here, and I want to follow up on Judge Smith's question. So the claims in the underlying complaint would be which claims? There were two claims stated in the adversary complaint, Your Honor. Well, actually, really one claim. There was a declaratory relief claim stated. There was also what was positioned as a claim for injunctive relief. Injunctive relief is not actually a freestanding claim. Okay. The declaratory relief was declaratory relief. Declaratory relief on two issues, Your Honor. Okay. One was whether proceeding with the arbitration against Mr. Hoffman alone would result in a violation of the automatic stay. That's legally impossible because the automatic stay does not apply to non-debtors. So there is no possibility of prevailing on that claim on the merits. It is absolutely impossible. The second claim, which I believe has since been abandoned, was the suggestion that the alter ego claim that my clients were pursuing in the arbitration was actually property of the debtor and, therefore, could not be pursued by my claim. The Bankruptcy Appellate Panel did not uphold that finding. The Bankruptcy Court did not uphold that finding. It's contrary to all law. So what you wanted the Bankruptcy Court to do then was to evaluate the likelihood of success on the claim that the arbitration would violate the automatic stay. Yes, Your Honor. Well, and they could also certainly assess the likelihood of success on the claim relating to the alter ego argument. That was the Court's proper promise was to assess the likelihood of success on the claims that Excel actually promulgated in the case. And it is worth noting, Your Honor, two things. First, that Excel did not argue to the Bankruptcy Court that it was likely to succeed on the reorganization problem. That's why the evidence, as the Bankruptcy Court argued, did not present any evidence, and there was no evidence to present. Again, the evidence screams out from the fact that we're three years into a Chapter 11 case. There's no hope of a plan of reorganization. Everyone has admitted, and we cited for this, and it's in the excerpt of the record, Your Honor, everyone has admitted that what really needs to happen here for any plan of reorganization to have hope is for Excel to win back the right to ownership of certain patents, a right that's already lost twice, once on summary judgment on the merits and the second as a terminating sanction for fabricating evidence. It has to overcome both of those things and somehow win back the patents to have any hope of reorganization, and everybody admits it. And so that's why there was no evidentiary record and why there was no argument that likelihood of success here on the merits should refer to likelihood of a successful reorganization. There is no basis for that showing here. The second point that ties into that, Your Honor, I think is a procedural oddity of this case, which is the Bankruptcy Court initially denied the request for injunctive relief by Excel, and the only thing that changed from the point in time when the judge denied an injunction to when he granted an injunction was that Mr. Hoffman came forward and said, no, no, no, if this arbitration goes forward, I want to present new claims and I'm going to waive the attorney-client privilege. They wanted to do that in the arbitration. That's the only fact that changed from denying the arbitration to granting the or denying the injunction to granting the injunction. And so I think it's important in this analysis here to look at what difference does that fact, Mr. Hoffman's threat, make to either likelihood of success on the merits or irreparable harm, which are the two prongs on the traditional test that need to be shown. What is your take on this, I guess I'm saying it right, the Pinsonin case, the Fourth Circuit case? One of our cases, a matter of Lockhart, analyzed this in connection with the maritime lien and talked about the domino theory. I'm not talking about Vietnam here. I'm talking about the effect of in this case where you have a state labor law that says that a company has to indemnify an employee for its actions and so on. The concern that if you allow something to go forward, if there is a judgment that's entered that the debtor is going to have to indemnify and therefore you're going to deplete the estate, is it your take that there's really no validity to the domino theory, that no bankruptcy judge really needs to worry about that, however large it might be? I think — I don't think I would go quite that far, Your Honor. I think the Eagle Pitcher case, which I think is the Sixth Circuit case you were referring to, is not the case. I'm not controlling law here, first of all. No, I understand that. But I don't think it would apply here even if that were the rule in the Ninth Circuit. Because this is an independent obligation? Well, in the cases that have looked to indemnification as a factor that goes to irreparable harm, those cases have involved situations, and Eagle Pitcher is certainly one, where there was a finding in that case that the non-debtor was entitled to, quote, absolute indemnity, unquote. And it was also established in that case that the debtor was entitled to draw on — sorry, not the debtor. The non-debtor was entitled to draw on the insurance proceeds of the debtor, and resulting in a finding based on the evidence that this would deplete the resources and frustrate a reorganization. That's not the factual scenario here. The record doesn't support that. Mr. Hoffman hasn't even filed an indemnity claim. And we believe there are very solid grounds for why he wouldn't be allowed to do that, including a late filing and some equitable concerns, again, relating to possible evidentiary legitimacy. And also, no claim here that he was entitled to any insurance proceeds. So even if he filed an indemnity obligation — Can I interrupt you for one second? Yes, Your Honor. Labor Code 2802. I'm not — this is California. I'm not familiar with an obligation that you have to file your complaint before there is absolutely an obligation to pay. Is that the law? Are you telling me that he would have no right to file a 2802 complaint if you got a judgment in connection with your arbitration? It would not be a question of being too late under California's Labor Code. It would be a question of too late in terms of filing a claim in the arbitration, that the proof date for claims expired. And that issue has very much not been decided. And would that be a bar to his filing a complaint in State court, for example? Yes, it would, Your Honor. So basically, the way the arbitration is structured, if Mr. Hoffman has not filed his by the time that decision is handed down, if it is, it's your position that he is forever barred from seeking an indemnity from the bankruptcy state in this case? Yes, Your Honor. I believe that is the bankruptcy law. If he has not filed a proof of claim by the time period set by the bankruptcy court, he's too late. And we have stated that position in the bankruptcy court. It has not yet been resolved. The other issue, though, that I want to address, Your Honor, which I think relates to that and relates to Eagle Pitcher more broadly, is if Eagle Pitcher is interpreted to stand for the proposition that merely threatening or even bringing an indemnification claim against an estate is a grounds for a non-debtor to get, in effect, an injunction or a stay against its litigation against it, that would be very bad public policy. Because there are countless instances. You could look at the Enron bankruptcy. You could look at WorldCom, MCI, lots of situations where former employees, former directors, former officers are facing charges based on their own malfeasance. If they can bring those claims against them to a halt simply by saying, well, I'm entitled to indemnity by the debtor, then there are no bounds to this aspect of Section 105 injunctions. That would be a bad step to take. And I don't think Eagle Pitcher takes you there on its own. And that, I think, was the most primary concern under the irreparable injury was the notion that Hoffman would bring an indemnification claim. The second factor that was an area of concern for the Court was the waiver, threatened waiver of attorney-client privilege. And that, again, Your Honor, I think that is essentially a legal impossibility because it turns on the notion that Mr. Hoffman would be bringing what he called an advice-of-counsel defense. It's a breach-of-contract arbitration that we're talking about, Your Honor. Attorney advice, advice-of-counsel is not a defense as a matter of law to a breach-of-contract. And so there is no basis to assert that and no threat, therefore, that attorney-client confidences will be revealed. And it is certainly noteworthy, Your Honor, that in the two weeks of arbitration hearings that were already held in this case, as they were held, this did proceed close to finality, there was no hint of advice-of-counsel defense. It was never pled. It was never mentioned. Mr. Hoffman himself was on the stand for four days of testimony. Never said a word about it. We think it's fabricated, Your Honor. Counsel, could you address the issue of finality for us, please? I gather you take the position that 158D is the statute that gives us jurisdiction. Is that correct? Yes, Your Honor. Because it's a BAP appeal. Yes, Your Honor. Okay. Why is this a final order? It is a final order by the nature of the relief and the severity of the relief that's afforded by an injunction. Injunctions are final. This is a preliminary injunction. It's a preliminary injunction, Your Honor. And that, Your Honor, relates to a secondary point. The bankruptcy court and the bankruptcy appellate panel focused on what they called the limited duration of this injunction. Three years by your account. Well, it's a year and a half so far in the injunction. It's three years on the bankruptcy proceeding. Okay. But the limit point, Your Honor, I think is particularly galling to our side, because the limit that is imposed is the absolute maximum jurisdictional limit of the bankruptcy court. It cannot impose an injunction that lasts beyond the confirmation date of the plan when it's enjoining litigation against a non-debtor. That is simply black letter law that it can't go further than it went. So to say that it's limited and when the limit is the limit of the court's jurisdiction is no limit. And that's why I think this is, in effect, not a preliminary injunction. This is a permanent injunction for the maximum duration the court can afford. And that's why it's final in your position. Yes, Your Honor. Okay. If I may save the rest of my time for rebuttal, Your Honor. Thank you. May it please the Court. My name is Scott Goodsell. I represent Appellee XL Innovations. I have reserved part of my time for Mr. Hansen, who represents Mr. Hoffman, co-appellee. At the outset, I believe that there are two arguments that are being made by appellants to this Court, two broad-brush arguments. They're separate and distinct, and I think they're being confused as they're being presented, and they need to be distinct. The first argument is that the bankruptcy court erred in granting the injunction, either on the facts presented or interpretation of the law. And that is the issue that I think is appropriately before this Court, is whether or not that is the case. Obviously, we contend that that is not correct. The BAP has also concluded that that is not a correct conclusion. The second argument. How can you argue that you're going to have success on the merits on this, counsel? You're, I don't know whether you represent Mr. Hoffman or XL. I represent XL. I do not represent Mr. Hoffman. Okay. Maybe I should save this for your other co-counsel. But as I understand it, XL has not filed a proposed plan of reorganization. Is that correct? That's correct. Okay. What does it have that's going to possibly make this successful? XL has primarily three different assets which are of significance. Okay. It has whatever its rights are to the patents which are the subject of the patent court. Isn't that already been litigated? There has been a summary judgment, and that, the time for that appeal has not, in other words, that appeal may still be taken. Okay. Do you plan to appeal that? Yes. Okay. And that has been known from the outset of this case. The value that has been assigned to those patent rights, I don't know that anyone has disputed, is $100 million. These are biometric patents or patents that involve biometric devices that are the things that you're using right now when you go to Safeway or other places, fingerprint scanners, retinal scanners. So there is tremendous potential value. That comes out of the same. That's the first prong as well. So you're kind of conflating those two, right, that the patent appeal and the value of the patents are one and the same. That's right. Whoever owns those, whatever is determined. So you have a quasi-expectancy here. Other than that, what do you have? All right. Second asset is there are other patents that XL owns that are not subject of the district court patent litigation, to which Indivost does not have any claim or interest. And what are those? Those are primarily patents that involve consumer-oriented devices, things related to your automobile, things related to household devices. That's really the area that was XL's. Have any of these been successfully commercially exploited at this point, meaning the other patents we're talking about? Products have been developed. I can't say that at the moment products are being sold. There are no funds to produce those products. Any license agreements? None that I'm aware of. What else do you have? The third issue is as part of the transaction whereby Indivost acquired its predecessor entity, there are about a million and a half to $2 million in stock proceeds to which XL would be entitled. Explain that again, please. Where did that come from? This came from Indivost's acquisition of an entity that had some of these patent rights. And XL had shares in that entity, and this is what they were to have received. It's this plus an ongoing royalty that goes to XL. Now, this, I gather, is disputed in light of the litigation, right? It is disputed. The money is refutedly in a trust account, and additional money is added as the royalties come due. Counselor, realistically, if you were to lose your appeal on the $100 million worth of patents, can XL reorganize? Yes. But it would be reorganizing around patents that may be worth on the order of several million dollars. The type of the reorganization would be very, very different depending on whether or not you win that appeal. That's correct. And that has Mr. Pfeiffer has argued here that XL has made no progress, has no possibility of a plan, and that's simply not a correct statement. I mean, I'm here as XL's counsel. We have two or three means of reorganization in mind. Part of that depends, though, on a lot of other factors that are happening in the bankruptcy court. For example, litigation was filed in the bankruptcy court in order to make a claim for turnover of the $2 million or $1.5 million, whatever is out there at the moment. If those funds were available, given that the presumably the unsecured debt, this is my estimation, is probably a half million bucks, a million bucks at the outside. There's a plan there which says if that money comes in, we can pay off the unsecured creditors in cash and the shareholders can carry on the litigation with the remaining proceeds. Now, that matter was teed up for summary judgment in the bankruptcy court. The judge decided that he could not make that decision on summary judgment, but also has not allowed discovery to go forward. So that means we've moved to a different alternative. There is the possibility, talking about those other patents, which are not district court patents, of having the existing shareholders or other shareholders finance the commercialization of those or licensing. And those aspects are being explored. Some of this is known, some of the facts I've mentioned are known to the bankruptcy court. Obviously, we don't share a lot of those facts with opposing counsel or what our intentions are, simply because they are the reason that we're in the bankruptcy. This is we are serious litigants in the district court litigation. There is a third possibility of simply financing the district court litigation to conclusion, and I believe that that's a realistic expectation. If that occurs, then the decision is, do we finish that litigation while we're still in bankruptcy, or do we propose a plan, get out of bankruptcy, and then finish that litigation? Are any of these assets that you've mentioned encumbered by any type of lien, either super-priority or pre-bankruptcy lien? No. No. No. Now, but that this whole course of discussion, this is the second point I wanted to raise. What is being the first argument is, did the court, did the bankruptcy court correctly grant this limited-duration injunction based on the facts that were before it? And that's the issue that should be on appeal here. What is the second argument that's being brought up here is, given that things have happened since that injunction was entered, this Court is being asked to come back and decide whether to lift that injunction, to change that injunction, essentially to act as a court, an original trial court, given 12 months or 18 months of subsequent history. I'm saying that's not right. Are you arguing that we don't have jurisdiction? I believe you have jurisdiction over this appeal. I don't believe that this Court has the ability to consider the subsequent events which were not before the original bankruptcy court. I believe that there are solutions for that. And which events would those be? Well, the issues that have been raised are, in the argument I've heard so far, is that in the last 18 months, for example, no plan has been filed by the Department. But that's true. The Court is welcome to take judicial notice of that. But even in the bankruptcy court's own injunction, the point that the bankruptcy the judge wrote in, that this was until a plan was confirmed, whether by Indivos, who had a pending plan at that time, which they subsequently withdrawn, or by the the specific provision. Let me see if I can find the specific provision. Since you don't have much time, let me get back to something that is that even you would agree we probably have the right to decide. And that is what was the standard on which the injunction was issued by the bankruptcy court and confirmed by the BAP based upon the facts as they existed at that time. And what I want to know is, from your perspective, from Excel's perspective, did the Court adopt the, in quotes, unusual situation Fourth Circuit standard, or were they trying to apply the more traditional Section 105 preliminary injunction standard? Actually, I believe that, as you read the record, it's clear that the Court made its decision under both standards, and the BAP made the same finding, that there was the 105A unusual circumstances standard, and the judge, the bankruptcy court, in fact, said, I'm going to find that this is applicable, and I'm finding that these are unusual circumstances, and here's all the reasons why I think I need to do this in order to protect the debtor's estate, because of my concerns about duplicative litigation, excessive litigation costs, the attorney-client privilege, all of these things. And then he said, and if I were to apply the traditional standard in terms of balancing of hardships, I still find that those things are applicable, and he then went on again for some period of time and said, and here's how these things apply. Now, I believe that the question is, what's our standard of review by your lights? What are we allowed to focus on in terms of the standards of either or, in your suggestion, both those standards? Well, frankly, Your Honor, I believe the standard is abuse of discretion. So then the question is, do the ---- That's right. The application of which law is correct is an abuse of discretion standard? The application of whether the court chose one ---- If the court applied the wrong law, is that a no-vote standard? Yes, it is. However, here the court applied, as to the law, applied both of the relevant legal theories. So you're suggesting we combine, that we adopt the unusual situation, combine it with 105 into a new standard? No, not at all. Your Honor, the first standard is as set forth essentially in Crown Vantage, which is you don't need the Ninth Circuit, 05, said you don't need to go through the weighting analysis as long as you can show that this is necessary to protect the bankruptcy estate. But in this case, this gentleman, Mr. Hoffman, has an independent obligation, as I understand it. Well, bear with me. Okay. And that is a standard that the bankruptcy court applied. The court then went on and said, however, I will also review this under the traditional weighting standard in terms of balancing the harms, et cetera. So the court has applied both standards. And I don't think that this Court can say the bankruptcy court was incorrect in using the Crown Vantage 105 bankruptcy special alternative. But he still made the bankruptcy court still made the same findings under the regular standard. So I don't think that this Court has to elect between one of the two, because the court applied, the bankruptcy court applied both standards. Now, as to the facts, I think that this Court is obligated to accept the findings that were made by the bankruptcy court and to simply determine whether those findings were sufficient given the standard that the court believes is applicable. I tend to believe that the Crown Vantage case should be read more broadly, and because bankruptcy is a complete, is a very different environment, given all of the number of factors that a court must weigh, including the interests of other creditors who are not parties to the case. Robertson, if we were to go to with the traditional four-part test and were to reach the question of the likelihood of success, what standard do we apply? And I understood Mr. Pfeiffer to argue that we should consider the likelihood of success on the claims in the complaint, which was then whether the arbitration would violate the automatic State provision, as opposed to a claim as to whether it would interfere with a successful organization. So do you want to comment on that? Yes, I would, briefly. Of course, Mr. Pfeiffer wants to define the complaint as narrowly as possible, because he'd like to find a way that we're not asking for appropriate sort of relief. I would suggest that if the Court looks at the complaint, and particularly additionally, if the Court looks at page 7 of our opening brief, the complaint for declaratory and injunctive relief makes the following request. We wanted to preserve certain alter ego claims which we believe were assets of the estate. Now, frankly, the Bankruptcy Court has never gotten to a ruling on whether those were claims of the estate or not, assets of the estate, and it never needed to because it found other bases in order to enjoin the arbitration. But that is still an open issue. And Mr. Pfeiffer's argument that they simply belonged to Indivos, notwithstanding, no court has found that they belonged to Indivos. The second thing is we wanted to halt what we perceived was going to be a violation of the automatic State in persisting in this litigation. It is the unusual aspect of this litigation where there is already a finding by the arbitrator for the acts of Hoffman that creates a potential where any claim asserted or litigated or accomplished against Hoffman becomes automatically a claim against the debtor. Third, we were concerned in that context about collateral estoppel or res judicata findings by the arbitrator which would bind Excel in other fora. And that was indicated in our complaint, that that was a concern. We also wanted to prevent, since Hoffman and Excel had been jointly represented in these proceedings, both proceedings that predated the arbitration and had been represented concurrently, well, to some degree, in the arbitration. Isn't that taken care of by the stipulation that there won't be any collateral estoppel effect in the arbitration? Well, the problem was that that, it's easily said, but practically it became impossible to enforce that. Why is that impossible to enforce? Well, let's assume that we are It might actually be very useful for the litigants to sort of know what the contours of the evidence are and know how it's going to, how it strikes at least one person, an arbitrator. Well, the But collateral estoppel is a, you know, is a judicially applied doctrine, and it seems to me that if the parties have agreed that there will be no collateral estoppel, that we have ways of enforcing that agreement. And if Mr. Hoffman goes to that arbitration and testifies to a certain set of facts or circumstances, where is our ability to cross-examine this at the time, or cross-examine him at the time that he makes some Well, that's why you're protected by the fact that there's no collateral estoppel. It will have no effect outside of the arbitration agreement. But it may have significant effects on either the evidence that he provides, especially if it violates any attorney-client privilege, which you can hardly call that dog back. And it may have impact on our ability, or on misrepresentations that he may make, which may impact the credibility of other witnesses subsequently. It was a good idea in July when we originally brought our action, July of 06. Unfortunately, practically, when we came back and found out what the arbitrator was intending, that in fact there would be evidence presented, that there would be other – there would be representations made by Mr. Hoffman, it became very difficult to discern how Excel's interest could be protected in an – in an economical matter. And that's why Judge Weisbrot ultimately came back and said, I've given this a lot of thought, I've tried to find another way to work this out, this is the only way that I can find that's going to solve that problem. Mr. Goodfellow, you wanted to reserve some time for the co-counsel. I did, and I apologize. We've consumed quite a bit of time with questions, so we will allow some additional time to Mr. Hanson. But at this point, we probably better hear from Mr. Hanson. Yes. Thank you, Your Honors. John Hanson representing Ned Hoffman. I'd like to pick up on this issue of what is the issue that – the merits of this case that Excel needs to prevail on in order to obtain an injunction. Counsel for the appellants has suggested that the complaint prayed for a relief that this action, the arbitration, would violate the automatic stay. But that's their reading of the complaint. The complaint actually in the request for relief does not seek that. If you look at the second prayer for relief in the complaint that was filed here, seeking a temporary restricting order and preliminary injunction and joining defendants, et cetera, from any of the following acts, taking any actions with respect to the pending arbitration which in any way affect plaintiff Excel's rights or remedies in connection with the bankruptcy proceeding. That's exactly what Excel asked for. But, counsel, ultimately, you have to satisfy the test, do you not? And I'd like to – since you represent Mr. Hoffman, I'd like to understand your perspective on the following. I'm troubled by how, in terms of irreparable harm and balancing the hardships, it seems this is a highly speculative damage, if you will. For example, you've either pled or somebody has briefed the concept that Labor Code 2802 that requires an indemnity of the employee would kick in here. And then it would – kind of the domino theory would affect the bankruptcy estate. But as I understand it, the critical agreement that Hoffman is alleged to have breached binds only Hoffman and not Excel. Is that inaccurate? At the time Mr. Hoffman entered into the – it was a settlement agreement. The question – there is a question whether he was acting only for himself or for Excel. And the arbitration was against both Excel and Mr. Hoffman for violation of that agreement. Right. But Excel's out of it now on that one. So with respect to Mr. Hoffman, though. Mr. Hoffman's position is at all times I was acting on behalf of Excel in the interest of Excel to protect the interests of Excel and its shareholders. What is your take on opposing counsel's position that your client will be barred from asserting a 2802 claim if the claim for indemnity is not pled and proven in the arbitration or in an adversary pleading in connection with the bankruptcy? I think his argument is that Mr. Hoffman cannot assert an indemnity claim if he didn't file a timely indemnity claim in the bankruptcy court, because the – they argue that the time for filing claims in the bankruptcy court has come and gone, and that he did not file a claim. And you agree with that? No. That's been litigated for almost as long as this injunction has been litigated in the bankruptcy court. And, in fact, that litigation over whether Mr. Hoffman has, in fact, filed a timely claim or whether he can be excused for having filed a claim after the bar date, which we deny ever existed in this case, there's about ten issues on that issue alone. That's an example of why this case is dragging on. These folks over here, the appellants, are litigating like crazy to prevent the ultimate opportunity of Excel to take an appeal and have an appellate court determine who owns these very valuable patents. They're throwing roadblocks in Excel's path. They're throwing roadblocks in everybody's path at any time. Okay. Given the relatively small amount of time we have, I gather you to say that you strongly disagree with what your opposing counsel says about a bar date. Is that right? Yes. Okay. Now, let's go on to the attorney-client privilege. The claim is that if the arbitration proceeds, that Mr. Hoffman will be compelled or will reveal attorney-client privileged information. It would break the privilege. You'd be able to discover other things and you would be damaged. But if that were true, in virtually every adversary proceeding where an officer of a company in bankruptcy makes the claim, I mean, it would stop virtually all adversary proceedings, wouldn't it? Well, I don't know how often that could be raised, but this is a unique situation. Why is it unique? You've got an officer of a company. Arbitration was pending against Excel and Mr. Hoffman. Right. At the time the bankruptcy was filed. Both Excel and Mr. Hoffman were represented by the same counsel and were presenting a common defense. Then the bankruptcy occurred and stayed the arbitration because Excel was a party to the arbitration. Now the opponents want to go back and restart the arbitration against Mr. Hoffman only. This completely changes the situation. Is Mr. Hoffman at this point going to continue to defend himself in a way that protects Excel, or is he now going to have to pull out all the stops and do whatever he has to do to protect himself, even if it harms his former employer, Excel? But does he have an obligation to Excel? I don't know of any obligation. If he's his former employer, it seems to me that Excel can take care of itself. It seems that Mr. Hoffman here is before the arbitrator. If there's no injunction in place, then it looks to be pretty clear that Mr. Hoffman has to watch out for himself. That's why he has separate counsel. That's why you're here. That's correct. And in doing that, he may take positions that are harmful to Excel. Well, is he going to lie? No, I didn't. Well, I didn't think so. I was going to hope that was going to be your answer. But if he's not going to lie, then you have to let the chips fall where they do, right? I mean, if it harms Excel, we're sorry about that, but. One of the ways that he may defend himself is he may say, I have to testify to conversations and advice that I received from Excel's counsel. I thought that we had an agreement in place or an understanding in place that we wouldn't have to do that. No, there's no such understanding. What the appellants wanted the bankruptcy judge to do was enjoin Mr. Hoffman from testifying to anything that would breach the attorney-client privilege. Now, if I understood Mr. Pfeiffer's argument, Mr. Pfeiffer's claim was that this was a breach of contract and, therefore, there wouldn't be any reason to have to rely on an advice of counsel defense. Well, is that in the record? Well, it's in the record of these proceedings. I don't know about the other. You'll have to tell me whether it's in the record below. I think that Mr. Pfeiffer is asking this Court to make a lot of factual findings on matters that are not in the record, and that what he's actually asking this Court to do. I don't think the agreement doesn't say that. I can't think of any factual finding, and we have to make it all. All we're looking at is the propriety of issuing an injunction against a non-debtor. Right. The Bankruptcy Court was sufficiently concerned with that, along with many other factors that he felt, proceeding in the arbitration against Mr. Hoffman, posed a threat to the bankruptcy case of Exel and its ability to reorganize. That was based on factual determinations that he made based on the evidence that was before him at the time. Now, a lot of what Mr. Pfeiffer and the appellants want this Court to do is to second guess the Bankruptcy Court's factual determinations as to whether these matters really do pose a threat to Exel or not. And the Court, this Court, is very constrained in reviewing the granting of a preliminary injunction in that respect. It has to give great deference to the trial court's determination as to what was, in fact, the likelihood of harm based on the facts before the trial court. Okay. Unless we have other further questions, we've given you quite a bit of your free time. I appreciate that very much. Thank you. Thank you, Mr. Hanson. Mr. Pfeiffer, we will afford you some additional time, not unlimited, but you may have some additional time if necessary to respond to questions and to counsel. Thank you, Your Honor. Let me just start with, I think, the last suggestion that was raised, which is that our argument that there is no need to raise attorney-client communications because there is no attorney advice of counsel defense here is somehow new and outside the record. In fact, that's not the case that was specifically raised in front of the bankruptcy court. It's one of the reasons we believe the bankruptcy court erred as a matter of law in not accepting that and disregarding that. But that is very definitely in the record before the bankruptcy court. I do also want to address a couple of other points that were raised. There was a suggestion made by Mr. Goodsell that the alter ego issue had never been addressed and was, in fact, still alive. That's actually not the case. It was specifically addressed. The court, in the first instance, denied injunctive relief, denied Excel's request for an injunction, and it did so in part because we stipulated and continue to stipulate not to address the alter ego claim further in the arbitration. So that's a moot point. It isn't one that is alive and needs to be addressed. There was a question that I think to some degree drew an answer relating to the Crown Vantage case, and I do want to briefly talk about Crown Vantage. I think it is clear from Crown Vantage and associated cases in this circuit that Crown Vantage did not establish a new, more lenient standard for injunctions under Section 105. That case did use the any conceivable effect language, but that language was very clearly used in the context of whether the court had jurisdiction over a dispute between parties outside the bankruptcy court. And that's the standard context in which that analysis is used. I think the American Hardwood case makes that very clear. It undertakes the same analysis and very clearly said jurisdiction is one thing, issuance of injunction is another thing. And also the Feetz case, if I'm pronouncing that right, F-I-E-T-Z case, also which was purely a jurisdiction case, no injunction involved there at all, set forth the standard for whether a bankruptcy court has injunction over a dispute involving a non-debtor. And that's where the any conceivable effect language comes in. The reason that Crown Vantage said that there was no requirement for showing of irreparable harm in that case was because the specific context of Crown Vantage, and Crown Vantage very expressly limited itself to that context, was the Barton Doctrine. The Barton Doctrine being the situation where a party sues a court-appointed officer such as a trustee or receiver. And the Barton Doctrine says that can only be done when there's prior approval of the court. In that situation, it had been established there was no prior approval of the court before suing the bankruptcy trustee. The only available remedy at law, or the only available remedy in that situation, is to enjoin the action. That's why no irreparable harm needed to be showed. And that's what Crown Vantage said. The one thing, the test that's been suggested here, if the standard for success on, a likelihood of success on the merits goes to a successful reorganization, we don't believe that should be the test. I've described that to you earlier. But at a minimum, if it were to be the test, it would seem logically in the injunction setting to require two things. First, an actual, supported by the evidence, non-speculative showing of likelihood of a successful reorganization. And second, some showing of how the absence of an injunction, in this case allowing us to proceed with our arbitration against Mr. Hoffman alone, would destroy those prospects of reorganization. We believe neither of those has been shown in this case. And with that, Your Honors, I'll... Thank you very much. We thank the arguments of counsel.
judges: Goodwin, Bybee, M. Smith